## Walbridge's Estate

Before Lamorelle, P. J., and Gest, Henderson, Van Dusen, Stearne, and Sinkler, JJ.

*Charles Myers* and *Philip Price*, for *Barnes, Biddle & Myers; Robert C. Walker* and *Robert T. McCracken; Clement B. Wood;* and *Thomas Stokes*, for exceptants.

*W. Logan MacCoy*, contra.

4

STEARNE, J., June 30, 1933.—Four creditors of this estate who failed to give written notice of their claims to the executors, as directed by section 46(c) of the Fiduciaries Act of June 7, 1917, P. L. 447, have filed petitions to open the adjudication, which has become confirmed absolutely in due course. They allege, in effect, that despite their failure to comply with the Act of Assembly, nevertheless, as distribution has not actually taken place and there is no harm done, the opening of the adjudication for their benefit is a matter of right, or at least of grace in the discretion of this court. The master recommends the dismissal of all petitions. The court is unanimously of opinion that the adjudication should not be reopened as concerns the petitions of the Girard Trust Company and Chamberlin, the first and second mortgagees. The minority are of opinion that the petitions of Evans and Montgomery, the petitioners with contingent liabilities, should be granted in part.

This decedent was a partner in a stockbrokers' firm. The firm purchased a valuable piece of real estate and decedent, as a partner, joined in two bonds given as additional collateral to two of the petitioners, Girard Trust Company and Chamberlin, who are the first and second mortgagees. The other two petitioners, Evans and Montgomery, partners in the firm, retired from the partnership and took from the decedent and the continuing partners an agreement of indemnity concerning the bonds accompanying the mortgages. It appears that these two petitioners were subsequently released from liability by both obligees, who now repudiate their releases. It also appears that one of the mortgages was extended and was not due at the time of the audit. The first two petitioners demand payment while the latter two desire a fund set aside to insure against possible future liability.

According to the testimony, what really happened is that two of the claimants relied upon the security of their mortgages and accompanying bonds and the other two upon their releases. None of them paid the slightest attention to the actual or possible liability of the decedent. They gave no written notice of their claims to the executors and consequently received no actual notice of the filing of the account. After the account was adjudicated and confirmed absolutely, the brokerage firm and three coöbligees upon the bond became insolvent and went into bankruptcy. The respective rights of all parties concerned immediately underwent tremendous change. The petitioners herein then, and then only, became vigilant to protect their respective rights and presented these applications.

As the majority of the court view it, the question of law involved is whether under such circumstances the petitioners possess the right or the equity to obtain the relief which they now seek. The master's report and the dissenting opinion recite the facts in detail, and give a full discussion of all the cases. We do not deem it necessary to enlarge upon the discussion of either fact or law.

We decide that petitioners were not entitled to receive actual notice from the executors of the filing of the account, because none of them gave written notice of their claims to the executors, as required by section 46(c) of the Fiduciaries Act of 1917: Downing, Exec'r, v. Felheim et al., Exec'rs, 309 Pa. 566. There is no mistake of law or fact apparent upon the record, and the court is unanimous that the review herein sought is not a matter of right.

It is strenuously urged, however, that if not a matter of right nevertheless as a matter of grace the court ought to exercise its discretion in favor of the petitioners, because despite their default there has been no actual distribution and no harm done the estate. The minority opinion concedes that as to the two petitioner mortgagees it would be unjust to open the adjudication, because in the meantime there has occurred a change in position of the rights of the

estate which, if the claim is allowed, will result in substantial harm to the estate. With this we agree. But the minority would allow the other two petitioners who possess a possible claim against the estate, in the event it is judicially determined their releases are invalid, to have the adjudication opened as to them and have a sum set aside to await any such possible liability. With this a majority of the court does not agree. Even a vigilant creditor with real equity may be denied relief where the rights of others are affected. Even a supine creditor, where there has been fraud, accident, or mistake, may in exceptional cases be granted relief if there are no intervening equities. But in the present circumstances the majority of the court deems it most unjust and inequitable to grant relief to creditors who, entirely content and satisfied with their respective collateral and situation and having no thought or intent to present any claim against the estate, sit idly by and allow the estate to be lawfully adjudicated. When a bankruptcy occurs 4 months after the adjudication becomes absolute and nearly 2 years after decedent's death, they for the first time decide to press their claims against the decedent's estate. They depend upon what they consider the fortuitous circumstance that the estate has not been actually distributed. What the contention merely amounts to is this: Where a creditor takes no steps to press a claim against a decedent's estate and allows his debtor's estate to be actually adjudicated, does the fact that there has been no actual distribution give such a creditor an equity and a second chance to present his claim, where matters arising *subsequent* to the audit make it highly advantageous to him so to do? Surely, judicial adjudication must have some finality. There is no case cited, or of which we are aware, that even suggests relief should be granted under such circumstances.

This result is not to be regarded as doing a possible injustice when we consider that the mortgagee creditors, as in Downing v. Felheim, supra, still have the security of the real estate on which their mortgages are charged. The other two petitioners have releases from liability from their obligees, which, even though threatened with repudiation, are still prima facie a complete protection against any possible liability. If petitioners have neglected to secure binding releases they must bear the burden of their own default.

All exceptions are dismissed and the decrees dismissing the petitions recommended by the master are approved and directed to be submitted to the court for execution.

HENDERSON and VAN DUSEN, JJ., dissenting in part.—We agree with the result arrived at by the majority with respect to the petitions of Girard Trust Company and Chamberlin, and the petitions of Evans and Montgomery so far as the latter ask indemnity against the Chamberlin mortgage.

Review after an audit for the purpose of admitting the claims of belated creditors is a matter of grace. When no harm has resulted to parties in interest by the delay and there is no other inequity, the power of review should be liberally exercised "even to protect parties from the effect of their own mistakes or blunders": Sloan's Estate, 254 Pa. 346, 350; Bucknor's Estate, 7 W. N. C. 470; Mitcheson's Estate, 11 W. N. C. 240; Troutman's Estate, 270 Pa. 310; Willing's Estate, 288 Pa. 337; Huff's Estate, 300 Pa. 64. Such relief was granted to a non-vigilant creditor in Cowan's Estate, 184 Pa. 339, a case which has never been doubted or qualified. It is not inertia or satisfaction with his security which will defeat the creditor, but harm to a legal right resulting from his lack of action. The majority opinion accepts the statement that such harm did result from the inaction of all four petitioners. An argument is made to the contrary by the petitioners, technical, it is true, but one which we think worthy of detailed examination. When so examined it appears to us that the

conclusion of the majority is correct, except that no harm resulted to the legal rights and remedies of the executors or beneficiaries by any act of Evans or Montgomery with respect to the Girard Trust Company mortgage, and that relief should be granted to them as to that item.

Testator gave substantially all his estate to his executors and trustees in trust to pay the income to his widow for life and then to his son for life, with remainder not necessary to mention. He died June 28, 1929. The executors' account was not filed and audited until January 5, 1931, and on January 12th the estate was awarded to the trustees for the purposes of the trust. The account was duly confirmed absolutely on January 28th. A schedule of distribution was ordered but has never been filed, and the securities have not been transferred to the executors as trustees.

Walbridge was a partner of West & Company, a firm of stockbrokers, which occupied No. 1511 Walnut Street. Legal title to the premises had been for some time in William West, trustee, who had given a declaration of trust to certain members of the firm, including Walbridge. A mortgage of $400,000 to the Girard Trust Company, trustee for sundry trusts, and a second mortgage of $100,000 to William B. Chamberlin, had beeen placed upon the premises, and the mortgages and the bonds accompanying same had been executed not only by William West, trustee, but by all the beneficial owners, including Walbridge. After Walbridge's death his executors received from the other owners payment of the estimated value of Walbridge's equity in the premises after deduction of the mortgages; but no quitclaim deed or other deed to the coöwners was given.

No claim upon either bond was presented at the audit. Interest on the mortgages had been paid, and all other covenants had been performed. On April 27, 1931, West & Company became bankrupt. Immediately both mortgagees presented claims upon their bonds to the executors and filed petitions for review.

Two of the coöbligors upon the bonds were Evans and Montgomery. They had retired from the firm before Walbridge's death, and each had taken agreements of indemnity from Walbridge and the others who remained against liability upon these bonds. When Montgomery retired, he obtained from each mortgagee a release of himself and Evans from liability on the bonds. In spite of this release, after the failure of West & Company both mortgagees made claims against Montgomery and Evans, and they thereupon filed petitions for review in order that they might present claims upon the indemnity agreements. No such claim was presented by either at the audit.

We note additional facts which are material, to wit: That the grant of letters and filing of the account were advertised according to law, that Evans and Montgomery knew of Walbridge's death, but that Girard Trust Company and Chamberlin did not; that none of the claimants knew of the filing of the account or gave notice to the executors of their claims; and that the executors had no actual knowledge that any of the petitioners were creditors, or gave any of them notice of the audit or mentioned such claims in the petition for distribution.

After answers were filed the four petitions were referred to the same master and were heard upon one record. He recommended that the petitions be dismissed, and all petitioners have filed exceptions.

The master's conclusions were as follows: That all four petitioners had prima facie standing as creditors, and would have been entitled to awards at the audit if their claims had been presented at or before that time. The awards to Evans and Montgomery would have been conditional to protect them if they were eventually found to be liable: Burton's Estate, 3 Dist. R. 755;

Bumm's Estate, 8 Dist. R. 191; Douglass's Estate, 10 Dist. R. 479; Black's Estate, 12 Dist. R. 720; Converse's Estate, 240 Pa. 458. After the audit, or certainly after the adjudication, creditors could only be heard by way of review, even though distribution had not been made. This review is not a matter of right under section 49 (d) of the Fiduciaries Act, as there was no "error in such account or in any adjudication". Attention was called to the fact that the review even under section 49 (d) was intended to secure "such relief as equity and justice may require." Review in such a case as the present is derived from the inherent power of the court, and is not to be granted unless consistent with "equity and justice." See Sloan's Estate, 254 Pa. 346, Chappell's Estate, 264 Pa. 486, Willing's Estate, 288 Pa. 337, and Bailey's Estate, 291 Pa. 421. The petitioners must ask for grace; and if harm has resulted to executors or beneficiaries or any other party in interest by reason of the delay, relief should be denied.

So far all the court agree with the master.

The master further found that harm had resulted to the estate, that is to say, to the beneficiaries, because during the interval from January to April, short though it was, West & Company had become bankrupt, the three remaining coöbligors had become insolvent in the sense that they had no more assets, and the value of the mortgaged premises had gone down rather than up both in the general market and because of the failure of West & Company, the tenant. Though not fully developed by the master, his reasoning in substance is that the Walbridge estate was only secondarily liable with respect to parties interested other than the mortgagees. It was therefore entitled to subrogation and entitled to have an assignment of the mortgage as evidence of such right: Com., to use, v. Froelich, 56 Pa. Superior Ct. 604; First National Bank of Ford City v. Bowser, 91 Pa. Superior Ct. 252; 3 Pomeroy, Equity Jurisprudence (4th ed.), sec. 1214; 2 Jones on Mortgages (8th ed.), sec. 1391. If the claims had been presented in January, he said, the Walbridge executors could have paid them and could have foreclosed the mortgage or claimed contribution from the coöbligors. By April the mortgaged premises were less valuable and the coöbligors were insolvent, so that the chance of salvage was materially less.

With this we of the minority agree so far as the Chamberlin mortgage is concerned, but there is an obscure fact which affects the argument with respect to the Girard Trust Company mortgage and may affect the conclusion. The latter mortgage had been extended and was not due until July 25, 1931. We refer to the fact as "obscure" because it was not remembered by the Girard Trust Company when its answer was filed, and, while the extension agreement was put in evidence, the bearing of the extended due date was evidently not specially called to the attention of the master.

The point as now made is that, as the mortgage was not then due, the Walbridge estate could not have been forced to pay at the audit. The court would simply have set aside a fund to await the due date in July. Until the Walbridge estate actually paid, it would have no right to contribution from the coöbligors or to be subrogated to the mortgagee's right to foreclose: Lytle v. Mehaffy, 8 Watts 267; Garrison v. Paul, 1 Pennypacker 380; Morrison v. Warner, 197 Pa. 59; Johnston's Estate, 20 Dist. R. 831. Or, if we consider the Walbridge estate as a grantor of real estate subject to a mortgage, entitled to indemnity from the grantee, no action would lie until the grantor was damnified by being obliged to make actual payment: Blood, Exec'x, v. Crew Levick Co., 171 Pa. 339; May's Estate, 218 Pa. 64; Faulkner v. McHenry, 235 Pa. 298; Borowsky et al. v. Margulis, 310 Pa. 420; Lowry, Trustee, v. Hensal's Heirs

et al., 281 Pa. 572. Even if we may suppose that the Walbridge estate had the option to pay at once, it still could take no legal action after doing so; and this statement of the argument brings it out in even greater force. For the party secondarily liable cannot, by paying, accelerate the due date of the obligation of the principal debtor, whether we are dealing with subrogation or contribution or indemnity. This seems obvious when it is stated. The Walbridge estate could have taken no legal action until July.

The respondents attempt to meet this by referring to the surety's right to be free from molestation and to proceed by bill in equity quia timet to compel the principal to pay though the surety has not actually paid; a right which the respondents allege they lost because the claims were not presented until circumstances had changed.

There is such an equitable right and it is different from the right to sue the principal at law for reimbursement of money which the surety has advanced: Condran v. Kennedy, 56 Pa. Superior Ct. 356; Ross v. Waite and Parks, 85 Pa. Superior Ct. 103; Ardesco Oil Co. v. North American Oil and Mining Co., 66 Pa. 375; Ruppel and McKinley v. Patterson et al., 1 Fed. 220; Ascherson v. Tredegar Dry Dock and Wharf Co., Ltd., L. R. [1909] 2 Ch. 401; In re Anderson-Berry, L. R. [1928] 1 Ch. 290. But this equitable right also arises only after the debt is due, and does not hasten the due date: American Bonding & Trust Co. v. Logansport & W. V. Gas Co., 95 Fed. 49. The surety may find it inconvenient to pay or impossible to do so, and therefore may compel the principal to perform his promise in order to keep the threat from hanging over the surety indefinitely. But the surety ought not to be able to demand counter-indemnity or to force payment after the obligation has been entered into and before it matures. The case of Ross v. Waite and Parks, supra, which the respondents rely on, was a case where the principal voluntarily gave to the surety a counter-indemnity before the debt was due, in the shape of a demand judgment note; and it was held that the surety might proceed on this note at once, as the contingent obligation of the surety was good consideration and the note was therefore not in fraud of other creditors.

The respondents also argue that they were prejudiced by the delay in presenting the Girard Trust Company claim in that, if the claim had been known in January, they might well have obtained a voluntary release from the mortgagee, or a release for something which could have been paid on account by the primary debtors or even by themselves. They point to the release of other obligors without payment and to the appraisement of the property by the Girard Trust Company in December 1930 at an amount substantially in excess of the mortgage. But June 1928, when Montgomery retired, was very different from January 1931, when the audit was held. The respondents also argue that in January the principal debtors might have come to their rescue because of moral obligation and friendship. These are speculations at best; and we think the lack of equity which will prevent review must result from the loss of a legal right, not the loss of a friend. We do not take into account the necessary delays of litigation; we must suppose that the principal would immediately recognize and do his legal duty.

There still remains another consideration. Would not the Walbridge estate have had the right to pay the mortgagee at once and demand an assignment? Our statute (Act of April 28, 1903, P. L. 327) applies only to a mortgage which is due. But it would seem that if the mortgagee asks that a fund be set aside he is substantially asking payment, and may be compelled to accept payment; or, to put it differently, if he asks a court of equitable powers to protect him he may be put upon fair terms. A party secondarily liable who pays is entitled to subrogation in equity without statute and is entitled to legal evidence of

subrogation in the form of an assignment: Commonwealth, to use, v. Froelich, and other authorities cited above. When once the owner of the mortgage, might not the Walbridge executors have sold it or sold it at a discount? We have no evidence that the mortgage was marketable; but at least they would have had something in their hands, and the right to try to sell it. The mortgage was certainly less salable in April than in January.

No one can review this case without being impressed by the material effect of the West & Company failure on all parties concerned in these mortgages. The mortgagees knew instantly that a catastrophe had occurred. We are not called upon to weigh the amount of harm, only so that it materially affected a legal right of the party secondarily liable and worked "inequity and injustice."

We conclude that the master was right in respect to the Girard Trust Company as well as Chamberlin in finding that harm had come to the Walbridge estate during the delay, though not for the reason he gives.

Counsel for Chamberlin, whose mortgage was overdue, argues a different ground of review on behalf of himself and others to whom it may be applicable. Referring to Ford's estate, 16 D. & C. 531, it is said, that while the executors had no knowledge of testator's bonds, they had a clue which would have led to such knowledge; that the obligees were therefore entitled to notice of the audit and to a review because of failure to give them notice. To this it may be answered that the executors are not bound to look for creditors; that the means of knowledge is not knowledge where there is no duty to seek for knowledge; that failure to notify a creditor of whom the executors did not know, but only should have known, is not "fraud" and "false swearing", which is the ground of decision in the Ford case; and that the court en banc just decided in Bilyeu's Estate, 18 D. & C. 662, that the Ford case has been modified by Downing, Exec'r, v. Felheim et al., Exec'rs, 309 Pa. 566, to the extent that mortgage bondholders who give no notice of their claims are not entitled to notice of the audit. We of the minority do not regard the Felheim case as overruling the general principle of Ford's estate as to ordinary creditors.

Evans and Montgomery cannot make the same argument as Chamberlin and the Girard Trust Company with respect to constructive notice, for it is not claimed that the executors had any clue to the indemnity agreements. We ought not to assume that they stand or fall with the mortgagees, and ought to examine their positions separately. What could the executors have done to protect the estate if Evans and Montgomery had presented claims in January?

The executors could have taken up the overdue Chamberlin mortgage and have foreclosed or asked contribution or indemnity, just as if Chamberlin himself had presented a claim. Evans and Montgomery therefore may not now ask indemnity against that mortgage.

But with respect to the Girard Trust Company mortgage, the executors could have done nothing. If the Girard Trust Company had not in effect demanded payment, the executors could not have tendered payment and taken up the mortgage. It may seem fanciful to suppose that Evans and Montgomery would have presented claims when the Girard Trust Company did not. But that is not a fair statement. We are asking what Evans and Montgomery did to prejudice the estate with respect to the Girard Trust Company mortgage claim; the answer is that they did nothing. The Girard Trust Company's delay caused injury, but the delay of Evans and Montgomery did not, because if they had come in alone—and they are to be charged with their own fault, not the fault of another—the executors would have been no better able to protect themselves with respect to the Girard Trust Company mortgage in January than they were in April.